(25 Misc. Rep. 570.)

### DORSETT v. ORMISTON et al.

(Supreme Court, Special Term, New York County. December, 1898.)

PARTNERSHIP—DISSOLUTION—DURESS—EVIDENCE.

Plaintiff sued to set aside the dissolution of a partnership; alleging that it was involuntary, and advantage was taken of his ill health. The firm was engaged in speculations, and had reached a critical stage. Plaintiff, whose physical health was affected by the firm's financial condition, proposed going away for his health, turning everything over to his partner for liquidation. A settlement was perfected, by which plaintiff was discharged from all firm liabilities. Plaintiff's was the leading mind of the concern, and it only required time and money to extricate the firm from its embarrassments. Either party was given an opportunity to assume the responsibility and furnish the capital to keep the speculations afloat, but plaintiff was unwilling to assume the risk. *Held* insufficient to justify the reopening of the settlement.

Action by Robert Clarence Dorsett against Thomas S. Ormiston and others to set aside an agreement dissolving the partnership, for duress and fraud. Judgment for defendants.

Edward C. James, Charles H. Knox, Frank J. Dupignac, and E. K. Van Beuren, for plaintiff.
John M. Bowers and Bowers & Sands, for defendants.

DALY, J. I am satisfied, from the consideration of the testimony and the well-prepared briefs on both sides in this case, that the plaintiff's allegations of duress and fraud are not sustained. The case presents itself to me under a certain aspect, which can be outlined by a brief reference to leading facts, without reciting the mass of details with which the main point in the case is surrounded.

Up to June 1, 1895, Ormiston & Dorsett had been co-partners for about 13 years in a law firm, whose business was almost exclusively speculation in real estate, and the making of building loans in connection with their sales; all of their operations being conducted by Dorsett. Neither partner had property or cash capital at the beginning, and the necessary funds for their speculations were obtained from their clients, the McCormack and Dorsett families,—the larger part from the McCormack family, into which Ormiston had married. The plaintiff, Dorsett, was an excellent accountant and methodical business man, and was very successful in accumulating for the firm an apparently large surplus of real-estate and mortgage securities; but the real estate was heavily incumbered, and the mortgages were chiefly junior incumbrances, the value of the whole depending upon what could be realized after a large outlay for carrying the properties. The same may be said with respect to the value of the mortgages, aggregating about $188,000, in which the firm had invested the money of their clients, the McCormacks, and which were held by the latter in the beginning of 1895. These were chiefly second, and some third, mortgages, which, taking the plaintiff's testimony as correct, Ormiston guarantied to the clients, Dorsett, in turn, agreeing with him to share any loss upon such guaranty, while defendants' evidence supports their claim of a firm guaranty of the principal and interest of the investments of the McCormack moneys. These mortgages represented assumed values of the real estate which the firm had bought, and sold to builders; and such values included all the profits made by the firm in its sales, together with commissions charged to the builders for loans, fees, expenses, advances for interest, etc. In addition to this liability, the partners were, at the time mentioned, liable on joint notes made to the Corn Exchange Bank aggregating $70,000, which represented moneys drawn by Ormiston for his private expenditures. The bank held as its principal collateral an accommodation mortgage of $35,000 made by Lincoln G. McCormack, and a second mortgage of $50,000 belonging to Isabella McCormack, which had been assumed by one Manning upon his purchase of certain property on which it was a lien, and which had been the subject of one of the firm operations. The bank also held as collateral for the said notes 13 $1,000 first mortgage bonds of the Chicago, St. Louis & Pittsburg Railroad Company, which belonged three to each of the defendants Annie Ormiston, Lincoln G. McCormack, and Ethel H. McCormack, an infant, and four to the estate of Fannie McCormack. In March, 1895, Manning failed; and the condition of the firm became critical, as the $50,000 mortgage thereby became practically worthless. The partners were liable to the bank for the whole $70,000, without recourse to any of the collateral. They were guarantors, in effect, of the principal and interest of all the McCormack mortgages, much of the property of which those mortgages were liens not yielding an income equal to the annual charges upon it. When the affairs of the firm reached this critical stage, in the early part of 1895, the plaintiff, without the knowledge of his partner, in order to secure his wife and sister for advances of money made to him, and

used by him in the firm operations, transferred to the former all his real estate, with two unimportant exceptions, and paid her $30,000 drawn by him from the firm about a month before the Manning failure, on account of his advances, and also transferred to his sister certain mortgages of the firm, aggregating $26,000, and credited the amount thereof on account of about $46,000 then due him from the firm for advances thereto, and, to procure repayment to the firm of a portion of Ormiston's overdrafts thereon, procured from Annie Ormiston and Isabella McCormack assignments of two inferior lien mortgages, aggregating $25,540, to himself, on behalf of the firm, and credited them against said overdrafts. These assignments were procured through his partner, Ormiston, as if in the regular course of business, by which investments were changed and handled at Dorsett's discretion. The firm was accustomed to carry its mortgage assets in Dorsett's name. The discovery of these transfers caused inquiry into the condition of the firm on the part of the McCormacks and the bank, and evoked charges of bad faith against Dorsett. The latter, whose physical health was badly affected by the condition of the firm's finances, and the difficulties in which it was involved, and from which only money and time could extricate it, proposed to go away for his health, turning everything over to his partner to liquidate; but this would require the latter to raise the large capital needed to satisfy the immediate obligations of the partners, and to carry the firm operations until they realized the expectations founded upon them. Negotiations ensued, which were carried on on the one side by Lincoln G. McCormack, Ormiston, and Thomas A. McIntyre (who acted in the interest of the Corn Exchange Bank, having procured the discount of the partners' joint note there for them), and by Dorsett, and Mr. Lathrop, of Brownell & Lathrop, acting as counsel for Mrs. Dorsett, on the other part. After much consultation, a settlement was reached by which Dorsett's wife and sister exchanged some of the securities they had received for others, Dorsett was released from all liability to the bank and to the McCormacks and to Ormiston, and by which Ormiston took all the assets of the firm, agreeing to discharge its liabilities, and the two mortgages received by Mr. Dorsett were retransferred to the clients from whom they had been obtained.

It is this arrangement which the plaintiff seeks to have set aside, claiming that it was not voluntary on his part, and that advantage was taken of his ill health to extort his surrender of the property and assets by threats of civil and criminal prosecution against him, on the false representation that the two mortgages last mentioned, and certain moneys and securities used by the firm, were trust property, and that the transfer to his wife and sister would be attacked on the ground that they were made in fraud of creditors. As to the last-mentioned transfers, it would seem that no suggestion from others could possibly add force to the apprehensions which any legal mind must have reasonably entertained of their being called in question. As to the alleged fraud and duress, I find that there was ample inducement for the plaintiff's agreement to the dissolution and the accompanying conveyances, in the condition

of the firm's prospects at and for some months previous to June 3, 1895, the time of the execution of the dissolution agreement. The condition of the firm at that period was so desperate that the plaintiff evidently felt it necessary to take some measures to secure his own family for its advances. Even if he believed that the firm had a surplus over its liabilities, he knew that it required money to handle its assets properly; and he knew that the enforcement of the bank's demand upon its notes for $70,000 would sweep the assets, as well as the surplus, out of existence. In the language of the plaintiff's brief, "He was unable to then pay the notes, and before he could have done so a judgment thereon could have been entered against him, and the damage would have been done." The plaintiff speaks with reference to the effect of such a judgment upon the firm's credit and his own health; but the enforcement of the judgment against properties which could only be rendered available as assets by careful nursing would have wiped them out completely, and left the partners deeply involved. That the debt to the bank was Ormiston's debt, as between the two, did not improve the plaintiff's situation. The firm assets must be sacrificed to meet it. It would seem, therefore, that, unless means could be procured to meet liabilities and protect the assets, it was plainly to Dorsett's advantage to give up his interest in the assets for a complete release. Had there been any possible way to extricate the firm from its embarrassments by employing any of its resources, it is certain that the plaintiff's ability, which, in his line of business, was undoubtedly great, would have perceived it. But it must have been evident to him that if he failed to put his own or his family's money into the concern, or failed to induce its creditors to forbear, and to advance more capital in addition to forbearance, he stood in a position to lose everything by regular process of law, and to peril the remaining resources of his family as well. It manifestly became a question as to which party would venture the capital required to keep the speculation afloat for the chance of even making the resources equal the liabilities. It does not appear that any obstacle was interposed to the plaintiff's undertaking by himself, or by any one on his behalf, the needed responsibility; and this, it seems to me, is the test of good faith in the settlement. But the plaintiff was not willing to assume the risk, and it was cast wholly upon the friends of Ormiston; and there does not seem to be anything unconscionable in the settlement which was proposed and carried out, if we consider the responsibility assumed. The case is wholly free from any indication of an advantage sought to be gained by superior knowledge and opportunities on the one hand, and ignorance and trusting confidence on the other. The partner now complaining was the master mind of the concern,—better acquainted with its true condition than his associate, or any of the parties who acted with the latter. There is wholly absent from the case such a condition as was found in Hasberg v. McCarty, 13 Daly, 415, cited by plaintiff, in which there was "at all times a feeling of the profoundest trust, confidence, and dependence on the part of plaintiff, and the assumption and attitude of protection and patronage on the

part of defendant, * * * the guiding and ruling spirit;" or in Platt v. Platt, 2 Thomp. & C. 25 (a case relied upon by plaintiff), in which "the knowledge of the condition of the business was exclusively with defendant, and the other [partner] never knew how it stood," and in which the transfers attacked were to be sustained upon defendant sustaining the burden of showing that they were arrived at after both parties had the same light possessed by the defendant. The conditions in those cases are exactly reversed in this; the superior knowledge and control of the co-partnership affairs resting always with the plaintiff, and dependence, trust, and confidence in all business operations of the concern remaining always with the defendant. And it was this relation which excited the feeling that was developed when it became known that the plaintiff, as was supposed, had endeavored, when the embarrassment of Manning became evident, to protect his own interests, at the expense of his partner's, by the transfers of securities to himself, his wife and sister.

The means which the plaintiff had within reach, of verifying the charge that the securities he had caused to be transferred to himself on behalf of the firm, or the moneys or securities used by his firm, were trust property, dispose of the claim of deception and duress. I cannot doubt that his acquaintance with the McCormack affairs, derived from his participation, as guardian and as attorney for certain of the heirs, in the legal proceedings in which they were concerned from time to time for a long period, together with the information he must have acquired in dealing with the funds of the family in the firm's real-estate operations, if they did not inform him fully as to the true ownership of the various securities transferred to the members of the family, and of the various sums used by the firm, furnished him at least with the ready means of ascertaining the facts, and guarding against imposition by any false pretense on the part of his partner or others in that regard. His first instinct would have been to verify the charge by an examination of the books, or by questioning the parties having knowledge. If his physical condition were such that he could not undertake such an examination personally, there was nothing to prevent his employing a competent person to make it, and such assistance was available as soon as Mr. Lathrop was called in to protect the interests of Mrs. Dorsett. And this leads to a pertinent observation with reference to the presence of Mr. Lathrop in the negotiations which terminated in the dissolution and transfers. Although Mr. Lathrop might be acting upon the original retainer for Mrs. Dorsett, the range of his negotiations seemed necessarily to embrace so much of the firm's affairs that he must have become very familiar with them. He certainly seems to have thought himself entitled to claim from Dorsett a part of his compensation for services which he deemed of benefit to the latter. Now, Lathrop was certainly not the man, under such curcumstances, to have suffered his client's husband to be coerced unlawfully, or defrauded, or practiced upon, in matters which were the subject of his constant investigation for a month, and which were finally closed under his personal super-

vision and with his concurrence. And, more, if any possible avenue of escape for the partners from their difficulties presented itself to a healthy, active, and acute mind, Mr. Lathrop must have been able to perceive; and I regard his participation in the negotiations on behalf of interests so close to Mr. Dorsett's, and his ultimate share in approving the result, as very strong proof that these negotiations were fairly conducted and reasonably concluded. Upon the whole case, I find no ground for reopening the settlement consummated on June 3, 1895, by the agreement and transfers which the plaintiff assails in this action.

Judgment for the defendants, with costs.